**Basiliki Andre GIANNOULIAS,**
Appellant,

v.

**Herman R. LANDON, as District Director, Immigration and Naturalization Service, Los Angeles District, Appellee.**

No. 14418.

United States Court of Appeals
Ninth Circuit.

Oct. 12, 1955.

Marshall E. Kidder, Frederick C. Dockweiler, Los Angeles, Cal., for appellant.

Laughlin E. Waters, U. S. Atty., Max F. Deutz, Robert K. Grean, Asst. U. S. Attys., Los Angeles, Cal., for appellee.

Before STEPHENS and FEE, Circuit Judges, and TAYLOR, District Judge.

STEPHENS, Circuit Judge.

This case comes before us on appeal from an order of the district court denying appellant's petition for a writ of habeas corpus in a deportation proceeding.

Basiliki Andre Giannoulias was born in Greece in 1912. Desiring to come to the United States, she registered under the Greek quota, first in 1937 and again in 1947, after the pre-war lists were destroyed.

Appellant's brother, Theodore, lived in Los Angeles and worked in a restaurant there. George Fitsos, one of his co-workers, had a brother, John, in New York who desired to get married. Theodore made known that he had an unmarried sister in Greece and at the instigation of George and Theodore a correspondence with exchange of pictures took place between appellant and John Fitsos. This correspondence resulted in a proposal to marry and in 1950, at a cost of over $700.00, John arranged for appellant's transportation to Nassau in the Bahamas where, on March 27, they were married in a civil ceremony. The marriage was not consummated at that time because of appellant's desire to treat the civil ceremony merely as a premarital arrangement and to have a Greek Orthodox wedding subsequently performed when the couple reached Los Angeles.

After the civil marriage, John filed a petition with the American authorities seeking recognition of appellant as his wife and her classification as a non-quota immigrant.[1] The petition was approved, a visa issued, and appellant was admitted as a permanent resident at Miami, Florida, on April 13, 1950. At this point John went to New York on business, and appellant proceeded to Los Angeles to join her brother. John came to Los Angeles about ten days later.

The contemplated Greek Orthodox ceremony was never performed.

Appellant claims she was ready and willing at all times to proceed, but that John became cold and indifferent and refused to set a date. John Fitsos' explanation is that after the lady's arrival in Los Angeles, she demanded certain guarantees of his financial solvency including transfer to her of an automobile, a $5,000 checking account, and a five-unit apartment building as a condition precedent to marriage. As a result of their differences, appellant and Fitsos never lived together as man and wife, and Fitsos filed for annulment of the marriage in Los Angeles on May 18, 1950. On advice of counsel, this action was dismissed and an appearance entered in a Nevada divorce action instituted by the instant appellant. Appellant was granted a decree of divorce on September 8, 1950, the court finding that the parties intermarried in Nassau and thereafter were husband and wife.

On November 27, 1950, appellant was arrested on an immigration warrant charging that she was subject to deportation because the preference quota visa on which she was admitted had been "obtained through fraud, in that she contracted a marriage to procure entry to the United States" without intending, and that she failed and refused and continues to fail and refuse, to fulfill her promise for such marital agreement. Following a hearing before an officer of the Immigration and Naturalization Service, appellant was held deportable on May 7, 1952. An appeal from this order was dismissed on July 9, 1953, by the Board of Immigration Appeals. A petition for habeas corpus filed in the district court on October 12, 1953, was denied by order of April 11, 1954, and from that order this appeal is taken.

Deportation is sought under the second paragraph of § 3 of the Act of 1937, as amended,[2] in force at the time of appellant's entry in 1950. This section provides in full:

"That any alien who at any time after entering the United States is found to have secured either non-quota or preference-quota visa through fraud, by contracting a marriage which, subsequent to entry into the United States, has been judicially annulled retroactively to date of marriage, shall be taken into custody and deported pursuant to the provisions of section 14 of the Immigration Act of 1924 on the ground that at time of entry he was not entitled to admission on the visa presented upon arrival in the United States. This section shall be effective whether entry was made before or after the enactment of this Act.

"When it appears that the immigrant fails or refuses to fulfill his promises for a marital agreement made to procure his entry as an immigrant he then becomes immediately subject to deportation." [Em-

---

1. Title 8 U.S.C.A. § 204(a), May 26, 1924, c. 190, § 4, 43 Stat. 155; July 3, 1926, c. 738, § 1, 44 Stat. 812; May 29, 1928, c. 914, §§ 1, 2, 45 Stat. 1009; July 3, 1930, c. 835, § 3, 46 Stat. 854; July 11, 1932, c. 471, § 1, 47 Stat. 656; Reorg. Plan No. V, eff. June 14, 1940, 5 Fed. Reg. 2423, 54 Stat. 1238 [Immigration and Nationality Act 1952, 8 U.S.C.A. § 1101(a) (27)]. See present procedure for granting non-quota status, Title 8 U.S.C.A. § 1155, June 27, 1952, c. 477, Title II, ch. 1, § 205, 66 Stat. 180.

2. Title 8 U.S.C.A. § 213a, May 14, 1937, c. 182, § 3, 50 Stat. 165. This section has since been repealed and replaced by Title 8 U.S.C.A. § 1251(c) (1) and (2), June 27, 1952, c. 477, Title II, ch. 5, § 241, 66 Stat. 204.

phasis added.] (50 Stat. 165, approved May 14, 1937.)

Appellant questions the validity of § 213a of Title 8 U.S.C.A. 50 Stat. 165, with particular reference to the last paragraph thereof, reading as follows:

"When it appears that the immigrant fails or refuses to fulfill his promises for a marital agreement made to procure his entry as an immigrant he then becomes immediately subject to deportation."

Congress authorized non-quota immigration to prevent the otherwise necessary separation of husband and wife or of a citizen of the United States and his or her intended spouse. The exceptions to the quota system of admitting immigrants not only acted to prevent such separation but opened an avenue for fraudulent avoidance of the quota.

In the instant case, the immigration authorities have held with finality and upon substantial evidence, that appellant alien entered into a fraudulent marriage for the purpose of entering into the United States without waiting for a legal entry under her quota number. And, even if the appellant actually entered into the marital agreement in good faith and actually went through the marriage ceremony in good faith but refused to consummate the marriage, she is subject to deportation. Thus, fraud is not a necessary element in the instant case. The evidence demonstrates that " * * * the immigrant [appellant] fails * * * [and also] refuses to fulfill his [her] promises for a marital agreement made to procure his [her] entry * * * [and therefore] becomes immediately subject to deportation."

The "marital agreement" as that term is used in the statute, plainly means more than the mere indulgement in the marriage ceremony. It means that the contracting parties at least begin in good faith to live together as husband and wife. There is nothing vague in the statute, as appellant claims, as to the meaning of the phrase, "promises for a marital agreement", though the phrasing is odd.

Appellant's claim that the statute applies to male persons only, is frivolous.

Affirmed.