**Martha G. ALMARIO and Romeo G. Almario, Plaintiffs–Appellants,**

v.

**ATTORNEY GENERAL; Immigration and Naturalization Service, Defendants–Appellees.**

No. 88–1134.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 8, 1988.

Decided April 7, 1989.

David K. Wenger, Detroit, Mich., Lucas Guttentag (argued), New York City, for Martha G. Almario and Romeo G. Almario.

L. Michael Wicks, Asst. U.S. Atty. (argued), Detroit, Mich., for Atty. Gen. and I.N.S.

Before KEITH, KENNEDY and MILBURN, Circuit Judges.

KEITH, Circuit Judge.

Appellants, Martha Goolsby Almario and her husband Romeo Almario, appeal the order of the district court granting summary judgment in favor of appellees, the Attorney General and the Immigration and Naturalization Service ("INS"). For the following reasons, we AFFIRM.

## I.

Romeo Almario, a citizen of the Phillipines, entered the United States on a six month visitor's visa on March 17, 1985. When his temporary visa expired, INS extended it for an additional six months; however Mr. Almario failed to leave the United States. On January 26, 1987, INS placed Mr. Almario in deportation proceedings for remaining in the United States

beyond the time permitted by his temporary visa. Admitting that he had overstayed, Mr. Almario requested voluntary departure by June 30, 1987. On June 29, 1987, Mr. Almario married a United States citizen, Martha Ann Goolsby. Mr. Almario did not leave on June 30th as scheduled. One week later, Mrs. Almario filed an "immediate relative" petition for her husband. INS denied the petition because the Immigration Marriage Fraud Act of 1986 ("IMFA") made Mr. Almario ineligible for "immediate relative" status, in that according to Section 5 of that act, any alien who marries a United States citizen during deportation or exclusion proceedings must leave the United States and remain abroad for two years before his citizen spouse may petition for him to return as a lawful permanent resident. On August 28, 1987, Mr. and Mrs. Alamario filed this lawsuit challenging the constitutionality of Section 5 of the IMFA and seeking to enjoin its enforcement against them.

On October 22, 1987, appellants filed a motion for summary judgment contending that Section 5 violated their due process and equal protection rights. INS filed a cross motion for summary judgment on November 12, 1987. On November 30, 1987, the Honorable Anna Diggs Taylor, United States District Judge for the Eastern District of Michigan, granted INS' motion for summary judgment. Appellants filed this appeal.

## II.

### The Immigration Marriage Fraud Amendments of 1986

Since 1921, limits have been placed on the number of immigrants eligible for permanent resident status in the United States. At that time, six preference groups were created, the most preferred being "immediate relatives".[1] Immediate relatives are excused from the numerical quotas imposed by the Immigration and Naturalization Act and are immediately eligible for certain benefits.[2] An alien who marries a United States citizen is entitled to immediate relative status and is also eligible for a permanent resident visa.

To apply for "immediate relative" status, the United States citizen had to file an "I–130" petition on behalf of the alien spouse. An INS officer would review the petition and interview the couple to determine whether a *bona fide* marriage actually existed. If the petition was approved, the alien spouse was eligible for permanent resident status.

In 1986, Congress passed the IMFA in response to a growing concern about marriage fraud. In enacting the IMFA, Congress sought to limit the potential abuse of "immediate relative" status by postponing the receipt of the many benefits afforded an alien married to a citizen. Under the IMFA, an alien spouse is only entitled to a two year conditional status as a lawful permanent resident. At the end of the two year probationary period, the condition is removed after a personal interview with an INS official so long as the marriage is *bona fide* and has not been terminated.[3] 8 U.S.C. § 1186a. Section 5 of the IMFA specifically applies to aliens who marry while involved in deportation or exclusion proceedings[4] and requires that the alien

---

1. "[I]mmediate relatives" ... shall mean the children, *spouses* and parents of a citizen of the United States. 8 U.S.C § 1151 (1982) (emphasis added).

2. Immediate relatives are also eligible for citizenship in three years instead of the customary five years. 8 U.S.C. §§ 1427(a), 1430(a) (1982).

3. The couple must also declare under penalty of perjury that the marriage was not entered into for money or other consideration for the purpose of helping an alien avoid deportation. 8 U.S.C. § 1186a(c).

4. Section 5 of IMFA, codified at 8 U.S.C. § 1255(e) provides that:

(1) An alien who is seeking to receive an immigrant visa on the basis of a marriage which was entered into during the period described in paragraph (2) may not have the alien's status adjusted under subsection (a) of this section.

(2) The period described in this paragraph is the period during which administrative or judicial proceedings are pending regarding the alien's right to enter or remain in the United States.

remain outside of the United States for two years after the date of marriage before becoming eligible to petition for "immediate relative" status.[5] Thus, if the marriage occurs any time after deportation proceedings have begun, the couple will not be allowed to prove that their marriage is legitimate and INS will not consider the I–130 petition until after the two year foreign residency requirement has been met.[6]

### III.

Initially, appellants contend that the district court, by applying the minimum rationality standard, used the wrong standard of review to resolve their constitutional challenge to Section 5 of the IMFA. However, it is well established that judicial review of INS decisions is limited by the authority Congress retains over immigration matters. *Fiallo v. Bell*, 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977); *Kleindienst v. Mandel*, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972); *Shaughnessy v. Mezei*, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953); *Chae Chan Ping v. United States*, 130 U.S. 581, 9 S.Ct. 623, 32 L.Ed. 1068 (1889). The Supreme Court has long acknowledged that Congress' unfettered discretion over the admission or expulsion of aliens "is a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Shaughnessy*, 345 U.S. at 210, 73 S.Ct. at 628. The Court also recognized that when exercising its power over aliens, "Congress regularly makes rules that would be unacceptable if applied to citizens." *Mathews v. Diaz*, 426 U.S. 67, 80, 96 S.Ct. 1883, 1891, 48 L.Ed.2d 478 (1976).

In *Kleindienst*, the Supreme Court affirmed the Attorney General's denial of a visa for a Marxist alien scholar even though this denial infringed on the first amendment rights of the United States citizens that wanted to hear him. The majority held that "when the Executive exercises the power[7] negatively on the basis of a facially legitimate and *bona fide* reason, the courts will neither look behind, nor test it by balancing its justification against the first amendment interest of those who seek personal communication with the applicant." *Kleindienst*, 408 U.S. at 770, 92 S.Ct. at 2585.

Similar to the case at bar, *Fiallo* involved a constitutional challenge to a statute placing restrictions on petitions for "immediate relative" status. The statute in *Fiallo* denied "immediate relative" status to the illegitimate alien children whose natural fathers are United States citizens but granted petitions to those illegitimate children whose natural mothers are United States citizens. *Fiallo*, 430 U.S. at 789–90, 97 S.Ct. at 1476–77 (citing 8 U.S.C. §§ 1101(b)(1)(D), 1101(b)(2)). Appellants in *Fiallo* raised constitutional claims similar to appellants' constitutional challenge to Section 5.[8] The Court upheld the statute by reemphasizing "the limited scope of ju-

---

**5.** Section 5(b), codified at 8 U.S.C. § 1154(h), provides that:

Notwithstanding subsection (a) of this section, a petition may not be approved to grant an alien immediate relative status or preference status by reason of marriage which was entered into during the period described in section 1255(e)(2) of this title, until the alien has resided outside of the United States for a [two] year period beginning after the date of the marriage.

**6.** At this time, if the couple is still married, they will have an opportunity to prove that their marriage was valid.

**7.** Congress has granted the Executive branch the power to exclude aliens under § 212(a)(28) of the Immigration and Naturalization Act. *Kleindienst*, 408 U.S. at 770, 92 S.Ct. at 2585. The Attorney General in turn has delegated broad

investigatory power to INS officers. 8 U.S.C. §§ 1154, 1225, 1357 (1982).

**8.** The appellants in *Fiallo* claimed that the statute:

(i) denied them equal protection by discriminating against natural fathers and their illegitimate children ...; (ii) denied them due process of law to the extent that there was established an unwarranted conclusive presumption of the absence of strong psychological and economic ties between natural fathers and their children born out of wedlock and not legitimated; and (iii) "seriously burden[ed] and infring[ed] upon the rights of natural fathers and their children born out of wedlock and not legitimated ...,"

*Fiallo*, 430 U.S. at 791, 97 S.Ct. at 1477 (quoting complaint).

dicial inquiry into immigration legislation." *Id.* 430 U.S. at 792, 97 S.Ct. at 1478.

Defending Congress' reasons for creating these classifications, the majority held that the political nature of immigration matters was better left to the province of the Executive or Legislative branches:

'The conditions for entry of every alien, the particular classes of aliens that shall be denied entry altogether, the basis for determining such classification, the right to terminate hospitality to aliens, the grounds on which such determination shall be based, have been recognized as matters solely for the responsibility of the Congress and wholly outside the power of this Court to control.'

*Id.* at 796, 97 S.Ct. at 1480 (quoting *Harisiades v. Shaugnessy*, 342 U.S. 580, 596–97, 72 S.Ct. 512, 522, 96 L.Ed. 586 (1952)). Similarly this court is equally limited in its review of Section 5 of the IMFA. The holdings of *Kleindienst* and *Fiallo* require that we exercise a very narrow standard of review assuming the classification at issue in this case is supported by a facially legitimate and *bona fide* reason.

### IV.

Appellants challenge the constitutionality of Section 5 of the IMFA on due process and equal protection grounds. Appellants argue that Section 5 places an unreasonable burden on their fundamental right to marry; precludes a couple from proving the legitimacy of their marriage; unconstitutionally classifies among alien/citizen couples and creates an unconstitutional irrebuttable presumption that their marriage is a sham.

#### A. Procedural Due Process

The Supreme Court has held that appropriate procedural safeguards be provided before any person may be deprived of life, liberty or property. *Board of Regents v. Roth*, 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). The Supreme Court has also extended the requirements of due process to aliens who have entered the United States. *See, Mathews v. Diaz*, 426 U.S. 67, 77, 96 S.Ct. 1883, 1890, 48 L.Ed.2d 478 (1976); *The Japanese Immigrant Case*, 189 U.S. 86, 100–01, 23 S.Ct. 611, 614–15, 47 L.Ed. 721 (1903); *Wong Wing v. United States*, 163 U.S. 228, 238, 16 S.Ct. 977, 981, 41 L.Ed. 140 (1896). However the individual must show that the interest is one protected by the Constitution or created by statute.

Appellants argue that Section 5 imposes an unreasonable burden on their fundamental right to marry because Mr. Almario must leave the country and his wife for two years before he will be eligible for permanent resident status. Although the separation may be avoided if Mrs. Almario leaves with him, the burden imposed by the statute is not relieved. Mrs. Almario, the citizen will have to choose between separation from her alien spouse during the first two years of their marriage and separation from her work, family, and the other benefits associated with living in the United States. Appellants claim that it is unconstitutional to place this burden on their marital relationship without first giving them an opportunity to prove the legitimacy of their marriage.

Although Mrs. Almario is faced with a difficult dilemma, the Constitution does not recognize the right of a citizen spouse to have his or her alien spouse remain in this country. *Burrafato v. U.S. Dept. of State*, 523 F.2d 554, 555 (2nd Cir.1975), *cert. denied*, 424 U.S. 910, 96 S.Ct. 1105, 47 L.Ed. 2d 313 (1976); *Silverman v. Rogers*, 437 F.2d 102, 107 (1st Cir.1970), *cert. denied*, 402 U.S. 983, 91 S.Ct. 1667, 29 L.Ed.2d 149 (1971); *Swartz v. Rogers*, 254 F.2d 338 (D.C.Cir.) *cert. denied*, 357 U.S. 928, 78 S.Ct. 1373, 2 L.Ed.2d 1362 (1958). Nor did Congress provide for this right by statute. *Smith v. INS*, 684 F.Supp 1113, 1118 (D.Mass.1988).

Congress passed the IMFA to deter immigration related marriage fraud. Section 5 specifically attempts to eliminate marriage fraud involving United States citizens and aliens subject to deportation. Congress, therefore, could not avoid affecting marriage in its efforts to eliminate marriage fraud. Congress could reasonably conclude that aliens facing immediate de-

portation were more likely to try to circumvent the immigration laws by marrying a United States citizen than aliens not facing deportation. In an effort to reduce the number of sham marriages, Congress, therefore, had a *bona fide* reason for enacting a statute that imposes a two year foreign residency requirement on deportable aliens. Accordingly, any denial of procedural due process created by Section 5 may only be remedied by Congress and not the courts.

### B. Equal Protection

■ Appellants next argue that Section 5 should be strictly scrutinized because it affects a fundamental interest and unreasonably burdens the marital relationship of some aliens and not others. Thus, appellants contend, the classification of aliens is violative of equal protection unless it satisfies an important governmental interest.

Without a doubt, Section 5 places a burden on the Almario's marital relationship, a burden not imposed on alien/citizen couples that marry before deportation proceedings have been initiated. While we agree that marriage is a fundamental right protected by the Constitution, as noted earlier, this statute involves the plenary power of the legislature to establish policies in the area of immigration and naturalization. "The role of the courts in analyzing an equal protection challenge to a federal immigration statute is limited to determining whether the statute at issue is conceivably related to the achievement of the federal interest." *Smith*, 684 F.Supp. at 1116. The federal interest at stake here is deterring sham marriages. Accordingly, although this statute involves a fundamental interest, we may not invoke "a higher standard of review than is normally employed in analyzing constitutional · challenges to immigration statutes." *Id.* at 1117.

■ Appellants contend that the distinction drawn between alien/citizen couples violates the equal protection clause. We believe the distinction Congress drew between aliens who marry while in deportation and aliens who marry before such pro-

ceedings have begun is rationally related to a legitimate government interest:

> It cannot be denied that Congress has a strong and legitimate interest in deterring marriages which are entered solely for the purpose of obtaining immigration benefits. Nor is it illogical to assume that aliens who are engaged in deportation proceedings are more likely than other aliens to enter into fraudulent marriages in order to avoid being expelled from the country. In many instances these aliens will have no valid defense to deportation and marriage to a [United States] citizen may be their only hope for remaining in this country. The [IMFA] is designed to deter marriage fraud in this susceptible group by removing the incentive to engage in a fraudulent marriage.

*Id.* We therefore agree with the district court that Congress had a rational basis for classifying aliens on the basis of when they married their citizen spouse.

■ Finally, appellants contend that the effect of Section 5's denial of a hearing creates an irrebuttable presumption, violative of due process, that their marriage, and every marriage occurring during deportation, is fraudulent. This argument was not explicitly raised below. In any event, we note that the Supreme Court has upheld quite similar classifications challenged on the basis that they create irrebuttable presumptions. In *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed. 2d 522 (1975), the Supreme Court upheld a social security law which, like Section 5, targeted fraudulent marriages for the purposes of obtaining benefits and did not provide appellants with an opportunity to prove that their marriages were valid. In that case, the Court said it was not unconstitutional for Congress to create arbitrary lines because:

> the question raised is not whether a statutory provision precisely filters out those and only those who are in the factual position which generated the congressional concern reflected in the statute. Such a rule would ban all prophylactic provisions ... Nor is the question whether the provision filters out a substantial

part of the class which caused congressional concern, or whether it filtered out more members of the class than non-members. The question is whether Congress, its concern having been reasonably raised by the possibility of an abuse which it legitimately desired to avoid, could rationally have concluded both that a particular limitation or qualification would protect against its occurrence, and that the expense and other difficulties of individual determinations justified the inherent imprecision of a prophylactic rule.

*Id.* at 777, 95 S.Ct. at 2472–73.

As previously noted, Congress may enact prophylactic measures that might otherwise be unconstitutional when exercising their authority in the area of immigration, so long as the measure is rationally related to a legitimate purpose. Because Congress could legitimately associate the incidence of marriage fraud with aliens facing deportation more so than with aliens who were not, it was not unconstitutional to classify alien marriages based on the status of the alien at the time of the marriage.

Accordingly, for the foregoing reasons, the judgment of the Honorable Anna Diggs Taylor, United States District Court, Eastern District of Michigan, is AFFIRMED.